**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| A. H. a minor, by his parents | : |
| ANTWAUN HAWKINS | : |
|     and | : |
| TAMESHA HAWKINS | :     Civil Action No. 05-1309 |
| | :     (RJL) |
|     Plaintiffs | : |
| v. | : |
| | : |
| DISTRICT OF COLUMBIA, *et al.*, | : |
| | : |
|     Defendants | : |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Come now defendants, by and through counsel, pursuant to Fed. R. Civ. P. 56, and move this honorable Court to grant summary judgment in their favor. As grounds for this motion, and as more fully discussed in the accompanying Memorandum of Points and Authorities, and Statement Of Material Facts As To Which There Is No Genuine Dispute, defendants submit that the challenged administrative determination that the District of Columbia Public Schools ("DCPS") provided the minor plaintiff with a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, was entirely appropriate.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia

/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2


/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625
E-mail: maria.merkowitz@dc.gov

May 16, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ : | | |
| A. H. a minor, by his parents | : | |
| ANTWAUN HAWKINS | : | |
|     and | : | |
| TAMESHA HAWKINS | : | Civil Action No. 05-1309 |
| | : | (RJL) |
|     Plaintiffs | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

Preliminary Statement

On May 23, 2005, an administrative Hearing Officer ("HO") issued a

Determination pursuant to the Individuals with Disabilities Education Act, 20 U.S.C.

1400 *et. seq.*, in which he found that the Key School, a District of Columbia public

school, was an appropriate placement for the student and that the River School, the

private school proposed by the parents, could not meet the needs of the student.  (R. at

10) The parents are appealing the Hearing Officer's Decision ("HOD").

The minor plaintiff is a six year old special education student who has been

diagnosed with a bilateral moderate to severe sensor neural hearing loss (R at 106).  In

order to hear, the student employs bilateral digital hearing aids. (R at 106) The student's

primary disability is hearing impairment ("HI") which results in speech and language

problems.   (Tr. at 23)  (Tr. at 72, 81)

The student began attending the River School, a private school when he was two years old.  (Tr. at 85)   On January 7, 2005, an MDT/IEP[1] meeting was convened by DCPS to review the student's evaluations, revise his IEP accordingly, and determine an appropriate placement for the 2004 – 2005 school years.  (R. at 33)  Professionals who were qualified to engage in the placement decision making process from both DCPS and the River School, as well as the student's parents and attorney, attended the meeting.   (R. at 33, 40)  Both DCPS and the River School were in agreement about the goals and objectives of the IEP.  (R. at 36, Tr. at 127)  However, there was disagreement about DCPS' proposed placement of Key Elementary School.

Accordingly, on March 12, 2005, the parents filed a request for a due process hearing to have the student's placement remain at the River School.  The hearing was held on April 14, 2005.  At issue was whether "DCPS denied the student FAPE by failing to provide an appropriate educational placement for [the student]."  (R. at 3)  The parents alleged that the student was receiving educational benefit in an "all inclusive" setting with non-disabled peers at the River School.  To remove him from the least restrictive environment to a "self contained" environment, such as that at Key, would constitute a denial of FAPE.  (R. at 4) On the other hand, DCPS asserted that it could better implement the student's IEP because the Key program has certified special education teachers trained in teaching hearing impaired students, whereas the River School does not.  Further, DCPS argued that the student had made little if any academic progress at the River School based upon his test results.

At the conclusion of the hearing, the Hearing Officer found that "[a] preponderance of the evidence supports DCPS' contention that the self-contained model

---

[1] Multidisciplinary  Team Meeting / Individualized Educational Plan

with teachers certified to teach hearing impaired students could provide [the student] academic benefit and, therefore, it would represent a free and appropriate public education…. "[I]t is abundantly clear that Amari's IEP mandates a 'self contained' setting. The Key School is the only self-contained program, which offers the specialized instructions and counseling services performed by certified teachers trained in teaching hearing impaired students."  (R at 10)

Plaintiffs contest the HOD, alleging that the HO erred by "attempting to remove A.H. from a classroom with non-disabled peers to one without non-disabled peers" in violation of the IDEA's requirements that a disabled child be educated in the least restrictive environment possible.  (Complaint at 3)

## **ARGUMENT**

### 1.    **The criteria for granting summary judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law." Farmland Industries, Inc. v. Grain Board of Iraq, 248 U.S. App. D.C.  276, 904 F. 2d 732, 735 (1990)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).[2]

[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of

---

[2] Anderson v. Liberty Lobby, Inc, supra, 477 U.S. at 248, similarly describes the rule for determining materiality:

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinning of those disputes.

an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[3]

To meet the initial burden of showing "the absence of a genuine issue of material fact" on an essential element of the non-movant's case, the movant may demonstrate that the respondent has no evidence to support an essential element of his or her case.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  In answer, the respondent must "present affirmative evidence" in order to defeat the motion, and "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion for summary judgment should be granted.  Id.

## 2.    The criteria for review of administrative decisions under IDEA

IDEA provides for judicial review in state or federal court to "[a]ny party aggrieved by the findings and decision" rendered in a due process hearing.  20 U.S.C. §1415(c).  In conducting such review, the reviewing court "shall receive the records of the administrative proceeding, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(e).  However, the "preponderance

---

[3] Celotex Corp. v. Cantrett, supra, is one of three cases decided by the U.S. Supreme Court in 1986 that govern the standard for granting motions for summary judgment.  Celotex Corp., supra;  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Company v. Zenith Radio Corporation, 475 U.S. 574 (1986). Celotex Corp. held that Rule 56 was to be administered with due regard to those opposing claims, as well as those advancing them, and that the purpose of the Rule was to dispose of claims that had no reasonable factual basis. 477 U.S. at 327, 323. Anderson held that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. 477 U.S. at 248, 254.  Matsushita held that where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." 475 U.S. at 587.

> . . . [T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials and lower courts have responded accordingly.

10 A. Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2727, n. 25 (1998).

of the evidence" standard "is by no means an invitation to the court to substitute their

own notions of sound educational policy for those of the school authorities which they

review." Board of Education of Hendrick Hudson Central School Dist. v. Rowley, 458

U.S. 176, 206 (1982).

The party challenging the hearing officer's determination bears the burden of

persuading the court that the Hearing Officer was incorrect. *Angevine v. Smith*, 959 F.2d

292, 295 (D.C. Cir. 1992); *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988);

*Lyons v. Smith*, 829 F.Supp. 414, 417 (D.D.C. 1993). While the Court is authorized to

make an independent determination, the Court "must also give 'due weight' to the

administrative proceeding and afford some deference to the expertise of the hearing

officer and school officials responsible for the child's education." *Lyons v. Smith, supra*,

829 F.Supp. at 418.

Accordingly, before this Court may reverse the Hearing Officer's decision, the

Plaintiffs must show by a "preponderance of the evidence," giving the Hearing Officer's

finding "due weight," that the Hearing Officer was wrong.

**3.     Under the Applicable Standards, Dismissal of the Complaint
         Herein is Required.**

To meet the requirements of the IDEA, a school district must provide each

disabled student with a free appropriate public education ("FAPE") tailored to his or her

individual needs. *20 U.S.C. Sec.* 1400(d)(1)(A). A free appropriate public education is

one "specifically designed to meet the unique needs of the handicapped child, supported

by such services as are necessary to permit the child to benefit from the instruction." *Bd.

of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 188-89 (1982).

In analyzing the first factor of whether the public placement violates IDEA, the court undertakes a two-step sub-inquiry, asking (a) whether the school officials complied with the procedures set forth in IDEA, and (b) whether the IEP developed through IDEA procedures was reasonably calculated to enable the child to receive educational benefits. *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982); *Knabley v. Bexley City Sch. Dist.*, 238 F.3d, 755, 763 (6th Cir. 2001). If these requirements are met, the State has complied with the obligations imposed by Congress.

In the instant case, plaintiffs do not contend that DCPS failed to comply with the procedures set forth in the Act or that the IEP was inappropriate. Accordingly, the only issue to be determined is whether the placement proposed by DCPS secures the student the right to a free appropriate free public education guaranteed him by Sec. 612 of the Act.

**A.  A mainstream environment is not always the least restrictive environment.**

Section 612(5) of the Act requires that "to the maximum extent appropriate" the student "be educated with children who are not handicapped," and that a child be removed from the regular classroom environment and placed in a special class only to the extent that "the nature or severity of [the student's] handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. Sec. 1412 (5) (B).

As Section 612 (5) of the Act makes clear, while the IDEA requires that children with disabilities be educated in the least restrictive environment ("LRE"), meeting the LRE requirement does not require that a disabled child be educated in the same

classroom with non-disabled children in all circumstances.  The placement must be appropriate so that the child can receive academic benefit.

Court decisions interpreting this provision have determined that the Act's mainstreaming preference is to be given effect only when it is clear that the education of the particular handicapped child can be achieved satisfactorily in the type of mainstream environment sought by the challengers to the IEP proposed for that child.  *See A.W. v. Northwest R-1 School District*, 813 F.2d 158, 163 (8th Cir. 1986) *cert. denied,* 484 U.S. 847 (1987) (holding that Sec. 1412(5) "significantly qualifies the mainstreaming requirement by stating that it should be implemented 'to the maximum extent appropriate,' and that it is inapplicable where education in a mainstream environment 'cannot be achieved satisfactorily.'")  *See also Mark v. Grant Wood Area Education Agency,* 795 F.2d 52, 54 (8th Cir. 1986), *cert. denied,* 480 U.S. 936 (1987) (rejecting "the view that the mainstreaming provisions of the Act are satisfied only if a handicapped child is educated in the same classroom with non-handicapped children"); *Maher,* 793 F.2d at 1483  ("the EAHCA does not compel localities to place handicapped students in regular education classes, but only in the least restrictive setting consistent with their needs and those of other students."); *Johnston by Johnston v. Ann Arbor Public Schools,* 569 F. Supp. 1502, 1508-09 (E.D. Mich. 1983) (finding no violation of the Act's mainstreaming goal where the transfer of a handicapped child from a regular classroom to a special education classroom was necessary and appropriate); *Taylor v. Board of Education of Copake-Taconic Hills Central School District,* 649 F. Supp. 1253, 1258 (N.D.N.Y. 1986) ("in some instances, a special facility will constitute the least restrictive environment for a particular handicapped child").

In the instant case, the degree to which DCPS's IEP and proposed placement satisfy the mainstreaming goal of the Act must be considered in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate education. *See Wilson v. Marana Unified School Dist.,* 735 F.2d 1178, 1183 (9th Cir 1984)  A major part of the task of local and state officials in fashioning what they believe to be an effective program for the education of a handicapped child is the selection of the methodology or methodologies that will be employed.  "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardians of the child." *Rowley,* 458 U.S. at 207 quoted in *Northwest R-1 School District,* 813 F.2d at 164.

**B. <u>Here, all parties agreed to the number of hours of specialized instruction and the goals of the IEP.</u>**

The record reveals that on January 7, 2005, the student's parents and his attorney attended an MDT/ IEP meeting.  An IEP was developed for the student which provided for 27.5 hours of special education and related services consisting of 20.5 hours per week of specialized instruction, to be provided by an educator of the hearing impaired and a speech and language educator, 6 hours per week of speech and language therapy, and 1 hour per week of audiology consult.  The IEP further called for the services to be provided outside a regular education setting for 98% of the time.  (R. at 40)  All parties

agreed to the speech and language and audiological goals. (R. at 36)  The parents also

agreed to full time specialized instruction.  (R. at 38) [4]

   **C.  <u>The Key School can provide the student with academic benefit.</u>**

       The record further reveals that the Key School has a program for the hearing

impaired where the focus is on "speech, language, audition, academics and cognition."

(R. at 37)  The program is modeled after programs recognized nationally as quality

programs for teaching of the hearing impaired.  (Tr. at 64)  The program has three

teachers of the hearing impaired who are trained in teaching the deaf with an

auditory/oral approach, an audiologist on staff full time, a speech therapist and service

providers as needed.  (Tr. at 51, 52, 71)

       The teachers have national resources to draw upon through a program assistance

project.  (Tr. at 71)  Ms. Amy Roberts, who would be the student's teacher, has a

Master's degree in education of the deaf, a Bachelor's degree in communication

disorders, and has worked as a speech and language assistant under the direction of a

speech and language pathologist.  (Tr. at 35-36, 52)

       Ms. Roberts testified that she has six hearing impaired students in her class.  (Tr.

at 52) Her school day is spent conducting academic instruction, and speech and language

audition. Her students also receive speech and language pull out services.  (R at 37)  Ms.

Roberts' class is integrated with the regular first grade classes for physical education, art,

music, library and computers.  (R at 37, 44)

       The students are gradually mainstreamed into different academic programs when

they are ready—when their speech and language, academics and socialization are at an

---

[4] The parents did not agree that full time specialized instruction equated to full time special education
in a self contained classroom.  (R. at 38)

appropriate level.  (Tr. at 45) The goal of the program is to provide the students with the skills to be able to function well in a mainstream setting.  (Tr. at 45, 74)

On the other hand, the River School "is a full day 11 month program with typically developing peers."  (R. at 35)  The student would be taught by a regular teacher, Ms. Mantle, who does not have a Master's degree, and who has not been trained in teaching the deaf.  (Tr. at 70, 83, 132, 142, 144)  The last time Ms. Mantle taught a hearing impaired student was in the 1988-1989 school year.  (Tr. at 144-145)  While the student would be in an integrated classroom, the only interacting with those students, observed by Ms. Roberts during a visit to the school, was during snack time.  (Tr. at 39)  Additionally the class size would be larger at the River school than at Key.  At Key the student would be one of 7 students in the classroom, whereas the classroom at River has approximately 13 – 14 students.  (Tr. at 42)

### D. __The student has not made significant progress while at the River School.__

In 2004, when the student was 4 years and 9 months old he underwent a number of evaluations "to measure his speech and language development, and to create appropriate goals for his Individualized Education Plan (IEP)."  (R. at 106)  In the Peabody Picture Vocabulary Test, which tests receptive one-word vocabulary, the student scored in the below average range, with an age equivalent of 3 years.  (R at 107) In the Expressive One Word Picture Test, which is a test of expressive one-word vocabulary, the student scored in the 1% rank, meaning that 99% of children his age scored higher. (R at 107)  The student's overall receptive language score was 50, "which is more than three standard deviations below the mean of 100 and significantly delayed compared to the average range of scores 85-115.  In addition, his percentile rank of 1 indicates 99% of

children his age scored higher…."  (R at 109)  "The student's "Expressive Language
Score of 61 also indicates a significant delay in his expressive language development
given the average range of scores is 85-115.  A percentile rank of 3 shows that 97% of
children his age scored higher…."  (R at 109)  The student was also evaluated on the
Reynell Developmental Language Scales, which asses a child's verbal comprehension
and expressive language.  Again the student ranked in the bottom 1% of persons tested.
The student's score indicates that his developmental language age of 2 years, 4 months
was much less than his chronological age of 4 years 9 months.  (R. at 109)

     The HO was not only able to review the student's evaluations, which indicate that
he has not made much progress at the River School, despite being there since age 2, but
also heard the testimony of his River School classroom teacher.   Ann Mantle testified
that the student was still functioning at a lower level than the other students.  (Tr. at 143)
Further, in the MDT notes Ms. Mantle "reported that in November [2004] [the student
was] not making significant progress."  (R at 36) (Emphasis added)

     The HO further heard the testimony of Ms. Sharon Millis, an independent special
education advocate who testified on behalf of the parents.  Ms. Mills testified that "[t]he
acquisition of language is tremendously important for [the student] and he's really way,
way behind.  And as he gets older, it's going to fall further and further behind unless he's
able to have someone who can help him catch up or move in that direction….Without
language, he's not going to be able to read, he's not going to be able to interact there
won't be anything that happens for him."  (Tr. at 190-191)  (Emphasis added)

The student's latest IEP indicates that "he [is] functioning at approximately a 3-year old level development wise." (Tr. at 67)  Thus the is approximately three years delayed despite having attended the River School for approximately four years.

**E.**  **The Key School is the Least Restrictive Environment for the Student**

In *Taylor v. Board of Education of Copake-Taconic Hills Central High School District,* 649 F. Supp. 1253 (N.D.N.Y. 1986) the court found that "in some instances, a special facility will constitute the least restrictive environment for a particular handicapped child." *Taylor* at 1258.  This is such a case.

Here, the student has a significant hearing loss.  (R. at 34)  Key Elementary School has a specific program for the hearing impaired which is modeled after some nationally recognized programs.  (Tr. at 64)  The classes are small, and the students are taught by a certified teacher of the deaf, who has been trained in academics, as well as in teaching the hearing impaired.  (R. at 37, Tr. at 71)  The students are mainstreamed into certain activities with the support of a teacher of the hearing impaired and the ultimate goal is to mainstream the students into all classes. (R. at 37, Tr. at 37)

On the other hand, in the River School program, the students are taught by teachers who have not been trained to teach hearing impaired students and who have virtually no experience teaching a hearing impaired child.  (Tr. at 141, 144)  The student has attended this private school since he was two.  Now at almost 5 years he is performing at approximately a 3 year old level.  Thus it is obvious that the educational benefit for the student cannot be achieved satisfactorily in the mainstream environment.

Rather, the student will benefit more from a school where his teacher would be specifically trained in teaching the hearing impaired and who knows about hearing loss and how to develop speech and language with a hearing loss.  (Tr. at 59)

## CONCLUSION

DCPS is bound by D.C. Code Sec. 38-2501 to first place a student at a public school if the public placement is appropriate.  Here, DCPS presented credible evidence that the program at Key has a viable program that could meet the needs of this student. DCPS further presented evidence that the student was not gaining much educational benefit at the private school he has been attending for the past 3-4 years.  Accordingly, for these reasons and those stated above, this honorable court should find that the hearing officer was correct when he concluded that Key was an appropriate placement for the student, grant plaintiff's motion for summary judgment and dismiss plaintiff's Complaint.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia

/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2

/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625
E-mail – maria.merkowitz@dc.gov

May 16, 2006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| A. H. a minor, by his parents | : | |
| ANTWAUN HAWKINS | : | |
|     and | : | |
| TAMESHA HAWKINS | : | Civil Action No. 05-1309 |
| | : | (RJL) |
|     Plaintiffs | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
|     Defendant | : | |
| _____ | : | |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS

1. The minor plaintiff is a six year old special education student who has been diagnosed with a bilateral moderate to severe sensor neural hearing loss (R at 106).

2. The student's primary disability is hearing impairment ("HI") which results in speech and language problems.   (Tr. at 23)  (Tr. at 72, 81)

3. The student began attending the River School, a private school when he was two years old.  (Tr. at 85)

4. The River School is a full day, all inclusive program with non- disabled peers. (R. at 35)

5. The student is being taught by a regular teacher, Ms. Mantle, who does not have a Master's degree, and who has not been trained in teaching the deaf. (Tr. at 70, 83, 132, 142, 144)

6. The last time Ms. Mantle taught a hearing impaired student was in the 1988-1989 school year. (Tr. at 144-145)

7. The classroom at River has approximately 13 – 14 students. (Tr. at 42)

8. In 2004, when the student was 4 years and 9 months old he underwent a number of evaluations "to measure his speech and language development, and to create appropriate goals for his Individualized Education Plan (IEP)." (R. at 106)

9. The student scored in the below average range, with an age equivalent of 3 years in the Peabody Picture Vocabulary Test, which tests receptive one-word vocabulary, (R at 107)

10. In the Expressive One Word Picture Test, which is a test of expressive one-word vocabulary, the student scored in the 1% rank, meaning that 99% of children his age scored higher. (R at 107)

11. The student's overall receptive language score was 50, "which is more than three standard deviations below the mean of 100 and significantly delayed compared to the average range of scores 85-115; his percentile rank of 1 indicates 99% of children his age scored higher…." (R at 109)

12. The student scored 61 in Expressive Language. The average range of scores is 85-115. (R at 109)

13. The student was also evaluated on the Reynell Developmental Language Scales, which asses a child's verbal comprehension and expressive language. The student ranked in the bottom 1% of persons tested. (R. at 109)

14. The student's River School classroom teacher, Ann Mantle testified that the student was functioning at a lower level than the other students. (Tr. at 143)

15. The 1/7/05 MDT notes indicate that Ms. Mantle reported that the student was not making significant progress. (R at 36)

16. Ms. Sharon Millis, an independent special education advocate who testified on behalf of the parents, testified that the student was "really way, way behind" in his acquisition of language. (Tr. at 190-191)

17. On January 7, 2005, an MDT/IEP meeting was convened by DCPS to review the student's evaluations, revise his IEP accordingly, and determine an appropriate placement for the 2004 – 2005 school years. (R. at 33)

18. Professionals who were qualified to engage in the placement decision making process from both DCPS and the River School, as well as the student's parents and attorney, attended the meeting. (R. at 33, 40)

19. An IEP was developed for the student which provided for 27.5 hours of special education and related services consisting of 20.5 hours per week of specialized instruction, to be provided by an educator of the hearing impaired and a speech and language educator, 6 hours per week of speech and language therapy, and 1 hour per week of audiology consult. The IEP further called for the services to be provided outside a regular education setting for 98% of the time. (R. at 40)

20. All parties agreed to the speech and language and audiological goals. (R. at 36)

21. The parents also agreed to full time specialized instruction. (R. at 38)

22. DCPS proposed placing the student at Key Elementary School, which has a program for the hearing impaired.  (R. at 75)

23.  The program at Key is modeled after programs recognized nationally as quality programs for teaching of the hearing impaired.  (Tr. at 64)

24. The program at Key has three teachers of the hearing impaired who are trained in teaching the deaf, an audiologist on staff full time, a speech therapist and service providers as needed.  (Tr. at 51, 52, 71)

25. Ms. Amy Roberts, who would be the student's teacher, has a Master's degree in education of the deaf, a Bachelor's degree in communication disorders, and has worked as a speech and language assistant under the direction of a speech and language pathologist.  (Tr. at 35-36, 52)

26. Ms. Roberts has six hearing impaired students in her class.  (Tr. at 52)

27. Ms. Roberts' class is integrated with the regular first grade classes for physical education, art, music, library and computers.  (R at 37, 44)

28. The students are gradually mainstreamed into different academic programs. (Tr. at 45)

29.  The goal of the program is to provide the students with the skills to be able to function well in a mainstream setting.  (Tr. at 45, 74)

30. The parents disagreed with the proposed placement of Key and on January 21, 2005, filed a request for a due process hearing to have the student's placement remain at the River School.

31. The hearing was held on April 14, 2005.  At issue was whether DCPS denied the student FAPE by failing to provide an appropriate educational placement. (R. at 3)

32. On May 23, 2005, an administrative Hearing Officer rendered his Decision finding that "[a] preponderance of the evidence supports DCPS' contention that the self-contained model with teachers certified to teach hearing impaired students could provide [the student] academic benefit and, therefore, it would represent a free and appropriate public education…. "  (R. at 10)

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia

/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2

/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625
E-mail – maria.merkowitz@dc.gov

May 16, 2006