## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ANTWAUN HAWKINS, et al., | ) |
| **Plaintiffs,** | ) |
| | ) |
| | )    **Civil Action No. 05-1247** |
| v. | )    **JR** |
| | ) |
| DISTRICT OF COLUMBIA, et al., | ) |
| **Defendants.** | ) |

_____)

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

The Plaintiffs, by and through their undersigned counsel, hereby respectfully

move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment

on all claims, and in support of their Motion submit the attached Memorandum.

Respectfully submitted,

<u>/s/</u>_____
Douglas Tyrka, #467500
2807 27th St., NW
Washington, DC  20008
(202) 332-0038

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————————

ANTWAUN HAWKINS, et al.,                )
            Plaintiffs,                 )
                                        )
                                        )    Civil Action No. 05-1247
v.                                      )    JR
                                        )
DISTRICT OF COLUMBIA, et al.,           )
            Defendants.                 )
————————————————————)

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

This case involves a claim for injunctive relief brought under the Individuals with

Disabilities Education Act, 20 U.S.C § 1400 et seq.[1] The Plaintiffs seek an injunction

ordering the District of Columbia Public Schools ("DCPS") to continue their placement

and funding of the Plaintiffs' son A.H. at The River School, a private school in

Washington, D.C.

        The heart of the dispute involves the most recent Individualized Educational

Program ("IEP") developed by DCPS, in which DCPS proposed to change A.H.'s

placement from The River School to Key School. The two placements differ primarily as

follows: The River School educates A.H. in an "inclusion" environment, in which he is

provided his specialized instruction in a general education class comprised primarily of

nondisabled students, co-taught by a teacher and a full-time dedicated speech/language

pathologist; at Key School, A.H. would be educated in a "self-contained" setting, in a

---

[1] Recent amendments to the IDEA became effective in July 2005, after all relevant events in this case. For that reason, all references to the IDEA in this brief refer to the older version of the law, 105 P.L. 17. The references to the statute refer to it as it was codified at 20 U.S.C. § 1400 et seq. The public law version is numbered 600 et seq., so § 1412 corresponds to § 612, etc. The federal regulations implementing the IDEA have not yet been changed, and remain published at 34 C.F.R. § 300 et seq.

class comprised solely of disabled children, taught by an instructor of the deaf and hard of hearing.

## FACTUAL BACKGROUND

A.H. has had a moderate to severe hearing loss since birth. R. 287-288.[2] He now uses digital hearing aids, with which he has only a mild hearing loss. R. 287. With the use of the aids, A.H.'s hearing is adequate to conduct normal conversation. R. 352.

A.H. did not begin using his hearing aids until he was approximately 2.5 years old. R. 287-288; Complaint at Paragraph 1. Before that, he had no mode of communication at all. R. 294.

Because A.H. could not hear or communicate at all until he was approximately 2.5 years old, he suffers from moderate to severe speech and language disabilities. R. 112, 293-295. According to the most recent evaluation in the record, when A.H. was 4 years, 9 months old, his speech and language abilities ranged from the equivalent of 2 years old to 3 years old. R. 107-111. A.H.'s greatest lag was in articulation. R. 111.

Because the aids largely negate his hearing impairment, A.H.'s speech and language disabilities currently have a greater impact on him than does his hearing impairment. R. 378-380. He currently needs daily support for speech and language, in an "an intensive, oral language-based learning environment with an emphasis on auditory-linguistic skill building and interactive opportunities for learning." R. 113, 147.

Importantly, A.H. also needs language models as part of his education. R. 34. He needs to be educated with a small group of nondisabled peers, who can provide him with appropriate language and social modeling. R. 113, 337, 346-347, 352-356. For the last

---

[2] The Administrative Record is not attached to this Motion and Memorandum, as it has already been filed by the Defendant.

few years, A.H. has been educated in that environment; if he is removed from that setting, those who know him believe his education will suffer. R. 304, 346-347, 389.

A.H. has been attending The River School since November 2001, when he was placed there by the DCPS. R. 196, 284; Complaint at Paragraph 10. The River School was founded to educate children with mechanically aided hearing in an environment with nondisabled peers, and it specializes in that model. R. 296-301.

The River School's goal for its disabled students is to transition them into regular education programs in which they need little if any special supports. R. 312. The River School has accomplished that goal with students similar to A.H. R. 311.

The River School is an "inclusion" program, in which each disabled student is educated entirely in classes in which the majority of students are not disabled. R. 214-215, 232-233, 298-299. Approximately 90% of the student body at The River School do not have any disabilities. R. 299. The River School provides "natural opportunities for language growth." R. 148.

The River School is an intensive, oral language-based environment. R. 300-301. The River School has fourteen speech/language pathologists on staff, and a student body of 172 students, only 10% of whom are disabled. R. 299, 306. Each class at The River School is co-taught by a teacher and a full-time, dedicated speech/language pathologist. R. 298-299.

During the 2004-2005 school year, in addition to A.H. the students in A.H.'s class consisted of six children without any disabilities, one child with a hearing impairment, and another child with aided hearing whose overall disabilities were negligible. R. 302-303. Like every class at The River School, A.H.'s class was co-taught by a teacher and a

speech/language pathologist. R. 302. In addition to her work in the classroom, the

speech/language pathologist participated in the development of the lesson plans for

A.H.'s class. R. 334-335. The speech/language pathologist co-teaching A.H.'s class had

training in the anatomy and physiology of the oral mechanism. R. 148.

A.H.'s other co-teacher had been certified for 35 years, and had been teaching for

24-25 years, the last four of which were at The River School. R. 321-322. She has daily

contacts with speech/language pathologists in addition to the one dedicated to A.H.'s

class. R. 322. Instructors of the deaf and hard of hearing at The River School often go to

A.H.'s teacher for teaching advice. R. 322-323.

The River School is providing A.H. with an appropriate education, with a state-

of-the-art model that is "doing beautifully" for him. R. 375-376, 388. A.H. has greatly

improved during his time at The River School, progressing educationally, socially, and in

receptive and expressive communication. R. 39, 115, 303-304, 309-310, 325, 344, 351.

In his first two years at The River School, A.H. progressed from having no mode

of communication at all to communicating verbally at skill levels ranging from those of a

typical 2-year-old to those of a typical 3-year-old. R. 106-113, 294. During his time there

A.H. has progressed from a 10-word vocabulary and an inability to speak in sentences to

extended conversations with adults and peers. R. 325, 345-346.

At The River School, A.H. has received "significant[] benefit from the inclusion

model with typically developing peers and benefits from learning from a master's level

education teacher and speech language pathologist." R. 106. He has particularly benefited

from his time spent at The River School with nondisabled peers. R. 328-329, 337-340.

A.H. has good social contacts at The River School among children with disabilities and those without. R. 325-328.

DCPS has not specifically criticized any teaching technique employed at The River School. The teacher from DCPS' proposed placement "[does not] think River School is a bad program," and believes that A.H.'s teacher is "fabulous." R. 246, 248. DCPS' own expert on the hearing impaired has acknowledged that The River School may be able to provide an education as appropriate for A.H. as that which DCPS' proposed placement would provide.

Key School, DCPS' proposed placement, is "brand new." R. 265. As of April 2005, at the time of the administrative hearing in this case, the proposed classroom teacher had previously taught only one full school year. R. 238-239.

Key School does not have a full-time speech/language pathologist on staff. R. 279.

Were A.H. to attend Key School, he would be in a "self-contained classroom" with only other disabled children. R. 216. At Key School, when the hearing impaired children do have opportunities to interact with nondisabled students, they tend to self-segregate. R. 371-372.

DCPS has not represented that A.H. would receive any specific instruction or service that he does not receive at The River School.

DCPS originally attempted to move A.H. from The River School to Key School at a June 21, 2004 IEP meeting. R. 121-123. At the June 21, 2004 meeting, DCPS justified its proposal of Key with the sole statement that "D.C.P.S. feels that Key Elem...is an appropriate placement for the student." R. 123.

Following the filing of an administrative hearing request by A.H.'s parents alleging that DCPS had failed to allow them full participation in the placement decision and had failed to propose an appropriate placement, DCPS agreed to a consent order to reconvene the placement meeting. R. 137-140.

DCPS convened a new MDT/IEP meeting on January 7, 2005. R. 145-168. At the that meeting, the team agreed on the IEP goals and objectives, but did not agree on DCPS's proposal of a placement for A.H. completely out of general education, with only disabled children. R. 150, 316-317.

More specifically, "[t]he team disagreed on service providers." R. 148. DCPS proposed that A.H. be taught by an educator of the hearing impaired, and that he be educated completely outside of general education. R. 152, 167, 168. A.H.'s parents, A.H.'s teacher, A.H.'s classroom speech/language pathologist, and The River School Speech and Language Director argued for A.H.'s continued placement at The River School. R. 259, 316-317.

At the meeting, the parents agreed that A.H. needed full-time specialized instruction, but stated their understanding "that full time specialized instruction as indicated on page 1 of the IEP does not equate to full time special education in a self contained classroom." R. 150. Because of their disagreement with the proposed placement and providers, A.H.'s parents did not sign the IEP to indicate their approval of it. R. 152.

At the meeting, DCPS did not provide any reasons why A.H. could not be educated in a general education setting. R. 145-168. In the IEP documentation in the section entitled "Explanation for removal out of regular education classroom," DCPS

stated only, "The student is in need of an out of gen. ed. setting." R. 167. In the section entitled "Placement Considerations and Justification," as the reason for rejecting a full-time general education placement and a combination placement, DCPS stated only, "LRE – rejected." R. 167.

In the written "Prior Notice" produced at that meeting, proposing the transfer to Key School, in the section entitled "Description and Explanation of agency action proposed or refused," DCPS stated only "Out of general education proposed." R. 168. In the section entitled "Description of Other Options Considered and reasons for rejection of each option," DCPS stated only "General education + combination general education with resource rejected." R. 168.

The Plaintiffs filed the most recent amendment to the administrative hearing request relevant to this case on March 12, 2005. R. 185-186. The hearing request alleged, among other things, the "[f]ailure to develop adequate IEP on January 7, 2005 (failure to list appropriate service providers (specialized instruction providers)...)," and the "[f]ailure to provide appropriate placement on January 7, 2005." R. 185.

An administrative hearing was convened on April 14, 2005. R. 2.

Three witnesses testified for DCPS: Pamela Owens, the DCPS "non-public day coordinator;" Amy Roberts, the teacher of the class proposed by DCPS; and John Schmidt, the DCPS "supervisor of the hearing impaired program." Only Mr. Schmidt was admitted as an expert, as an expert on the hearing impaired.

Five witnesses testified for the Plaintiffs: the Plaintiffs themselves; Mary O'Leary Kane, The River School Speech and Language Director; Ann Mannle, the (co-) teacher of A.H.'s class at The River School; and Sharon Millis, and independent special education

advocate and expert. Ms. Kane was admitted as an expert in speech and language

pathology, and Ms. Millis was admitted as an expert in special education.

Each Party submitted documents into the record, which were admitted without

objection and which are contained in the record. Additionally, the Plaintiffs submitted a

supplemental memorandum at the instruction of the Hearing Officer. R. 15-22.

Following the hearing, the Hearing Officer issued a Hearing Officer's

Determination ("HOD") that denied relief and dismissed the petition. R. 2-12. The

Plaintiffs filed the present Complaint on the basis of that adverse decision.

## STATUTORY FRAMEWORK

The Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq.

("IDEA"), guarantees "that all children with disabilities have available to them free

appropriate public education that emphasizes special education and related services

designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.300.

Each state (including the District of Columbia[3]) accepting federal funds under the

IDEA assumes several obligations, including: (1) to fully evaluate every child suspected

of having a disability; and (2) to develop an appropriate Individualized Education Plan

("IEP") for each qualified child on an annual basis. 20 U.S.C. §§ 1414(a)(1)(A) and

1414(d)(4)(A); 34 C.F.R. §§ 300.320, 300.342-347, 300.531-300.533; see Honig v. Doe,

484 U.S. 305, 311 (1988) ("The primary vehicle for implementing these congressional

goals is the [IEP.]...Prepared at meetings between a representative of the local school

district, the child's teacher, the parents or guardians, and, whenever appropriate, the

disabled child, the IEP sets out the child's present educational performance, establishes

---

[3] For purposes of the IDEA "[t]he term State means each of the 50 States, the District of Columbia, the
Commonwealth of Puerto Rico, and each of the outlying areas." 20 U.S.C. § 1402 (31).

annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.").

The IDEA requires that these services be provided in the least restrictive environment ("LRE"). 20 U.S.C. 1412(a)(5)(A); 34 C.F.R. § 300.500. The IDEA requires that each state have in effect policies and procedures that ensure that

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412 (a)(5)(A). Section 1412 (a)(5) is entitled "Least restrictive environment." Id.

The federal regulations require that "[i]n determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency shall ensure that…[t]he placement decision…[i]s made in conformity with the LRE provisions of this subpart…[and that a] child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum." 34 CFR 300.552.

Congress has repeatedly emphasized the importance of this requirement in fulfilling the goals and objectives of the IDEA. See 20 U.S.C. § 1400(c)(5)(A), (D)(finding that "[o]ver 20 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by . . . ensuring their access in the general curriculum to the maximum extent possible . . . [and] providing appropriate special education and related services and aids and supports in the regular

classroom to such children, whenever appropriate"); 20 U.S.C. § 1414(d)(1)(A)(iii)-(iv)(requiring each IEP to include a statement of a disabled child's ability "to be educated and participate with other children with disabilities and nondisabled children" and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class").

Congress has also afforded parents several procedural safeguards. See 20 U.S.C. § 1415. Among them are the right to a "due process hearing," and a provision allowing that "any party aggrieved by the findings and decision [at such a hearing] shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In such a proceeding, the focus of a reviewing court's inquiry is two-fold: (1) whether the state has complied with the procedural requirements of the Act; and (2) whether the IEP developed through these procedures is "reasonably calculated to enable the child to receive educational benefits." Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-207 (1982).

Recent amendments to the IDEA became effective in July 2005, after all relevant events in this case. For that reason, all references to the IDEA in this brief refer to the older version of the law, 105 P.L. 17. The references to the statute refer to it as it was codified at 20 U.S.C. § 1400 et seq. The public law version is numbered 600 et seq., so § 1412 corresponds to § 612, etc. The federal regulations implementing the IDEA have not yet been changed, and remain published at 34 C.F.R. § 300 et seq.

## SUMMARY JUDGMENT STANDARD

In general, summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, a trial court must draw all justifiable inferences in the non-moving party's favor, but the non-moving party may not rely on mere conclusory allegations, and "must present significant probative evidence tending to support" its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Unlike typical judicial review of administrative action, in suits filed under the Individuals with Disabilities Act ("IDEA") following an administrative hearing, the court bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). The Plaintiff must persuade the court that the hearing officer was wrong, and the court must explain its basis for ruling against the hearing officer. See Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988).

However, in IDEA due process hearings in the District of Columbia, DCPS "shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student." CDCR 5-3030.3.

11

**ARGUMENT**

I.     **THE HEARING OFFICER FAILED PROPERLY TO DETERMINE WHETHER THE IEP WAS APPROPRIATE AND TO DETERMINE WHETHER THE PROPOSED PLACEMENT WAS THE LEAST RESTRICTIVE ENVIRONMENT**

Even though the Plaintiffs had specifically contested the appropriateness of DCPS' IEP, had specifically claimed that DCPS had failed to offer a placement in the Least Restrictive Environment available, and had argued at length in the hearing and in a supplemental memorandum that DCPS had not offered a placement in the Least Restrictive Environment available, the Hearing Officer failed to address the Plaintiffs' concerns about the IEP and failed to consider the question of the Least Restrictive Environment in the HOD.

A.     **The Hearing Officer Failed Properly to Determine Whether the IEP Was Appropriate**

In the HOD, the Hearing Officer relied heavily on the January 7, 2005 IEP. R. 11. The Hearing Officer relied primarily on the conformity of the proposed placement with the IEP. R. 11. The Hearing Officer held that The River School "does not meet the needs of this student, as the school cannot implement the IEP." R. 11.

However, the before relying on the IEP, the Hearing Officer never addressed the Plaintiffs' dispute with the IEP. In fact, the Hearing Officer stated that "the IEP...is uncontested by either parent." R. 11. That statement is completely false.

The Plaintiffs – both parents, collectively – had repeatedly contested the IEP in several forums. As the IEP meeting notes indicate, at the meeting the Plaintiffs agreed with the IEP goals and objectives, but disputed the placement portion of the IEP. R. 150,

316-317. More specifically, as is stated in the notes, "[t]he team disagreed on service providers." R. 148.

At the meeting, DCPS proposed – and eventually wrote into the IEP – that A.H. be instructed by an educator of the hearing impaired, and that he be educated entirely outside of general education, at Key School. R. 152, 167, 168. A.H.'s parents, A.H.'s teacher, A.H.'s classroom speech/language pathologist, and The River School Speech and Language Director argued for A.H.'s continued placement at The River School, in a general education class co-taught by a teacher and a speech/language pathologist. R. 148, 259, 316-317. The Plaintiffs additionally noted their dispute with the IEP placement by stating their understanding "that full time specialized instruction as indicated on page 1 of the IEP does not equate to full time special education in a self contained classroom." R. 150.

The Plaintiffs did not sign the IEP to indicate their approval of it. R. 152.

The Plaintiffs continued to note their disputes with the placement portions of the IEP during the administrative process. In the most recent amendment to the administrative hearing request, the Plaintiffs alleged, among other things, the "[f]ailure to develop adequate IEP on January 7, 2005 (failure to list appropriate service providers (specialized instruction providers)...)," and the "[f]ailure to provide appropriate placement on January 7, 2005." R. 185.

Shortly after the beginning of the hearing, the Hearing Officer directly asked counsel, "Do either of you have any problem with the IEP?" R. 199. Plaintiffs' counsel responded, "Yes." R. 200. Counsel went on to explain that the Plaintiffs "don't have any problem with the goals; we don't have any problem with the classification of [A.H.]; so

the broad strokes of it we are fine with" but the Plaintiffs "disagree that the specialized instruction should be provided in fully separate special-education class." R. 201.

All of these specific statements of dispute aside, at every point in the hearing it was clear that DCPS was making a case for their proposed placement, a self-contained class at Key School taught by an instructor of the hearing impaired, and that the Plaintiffs were making a case for A.H. to remain at The River School, in a general education class co-taught by a teacher and a speech/language pathologist. The Hearing Officer seemed to understand that during the hearing, when he repeatedly questioned witnesses regarding inclusion classes versus self-contained classes, and instruction from instructors of the deaf and hard of hearing versus instruction by a co-teaching team including a speech/language pathologist. R. 242, 336, 337, 349, 389.

Despite his finding that the IEP was uncontested, the Hearing Officer independently held the IEP to be appropriate. R. 11. However, in doing so he failed properly to analyze the IEP.

"[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1985)(footnotes omitted).

The Hearing Officer analyzed the IEP as follows:

Qualified professional [sic], who were competent and qualified to develop an appropriate IEP for [A.H.] attended the MDT/IEP meeting. Moreover, the parents and their educational advocates were meaningful participants in the IEP decision-

14

making process; therefore, the IEP is appropriate and it is uncontested by either parent.

R.11 (footnote omitted). The Hearing Officer conducted only the first part of the <u>Rowley</u> analysis, regarding procedural compliance, and stopped there, completely ignoring the question of whether the IEP was "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 206-07.

Instead of determining whether the IEP – including its provisions that A.H. be educated solely with other disabled students, by an instructor of the deaf and hard of hearing – was reasonably calculated to provide A.H. benefits, the Hearing Officer simply held the IEP to be appropriate and therefore inexorably concluded that Key School was appropriate because it comported with the IEP and that The River School was inappropriate because it did not. By so doing, the Hearing Officer improperly failed to address most of the major issues in the administrative case.

**B.  <u>The Hearing Officer Failed Properly to Determine Whether the Proposed Placement Was the Least Restrictive Environment</u>**

The IDEA, the governing regulations, and the relevant caselaw require that school districts educate disabled children in the Least Restrictive Environment ("LRE") possible, that is, with nondisabled peers to the maximum extent possible.

The IDEA requires that each state have in effect policies and procedures that ensure that

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

15

20 U.S.C. § 1412 (a)(5)(A). Section 1412 (a)(5) is entitled "Least restrictive environment," also known as "LRE." Id.

The federal regulations require that "[i]n determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency shall ensure that…[t]he placement decision…[i]s made in conformity with the LRE provisions of this subpart…[and that a] child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum." 34 CFR 300.552.

In Rowley, the Supreme Court held that the IDEA "requires participating States to educate handicapped children with nonhandicapped children wherever possible." 458 U.S. at 202.

The courts of the District of Columbia Circuit have not addressed this issue directly, but the courts of other Circuits have, and have held that school districts must educate disabled children with nondisabled children wherever possible. See Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1982), cert. denied 464 U.S. 864 (1983) (the "very strong congressional preference" for mainstreaming requires that children be mainstreamed wherever possible, so that even where a segregated setting appears superior, if the services can be provided in a less restrictive setting, the segregated setting is inappropriate); Daniel R.R. v. State Board of Educ. 874 F.2d 1036 (5th Cir. 1989) (when a parent objects to a placement in a separate special education program, the court must first determine whether satisfactory education can be achieved in the regular education classroom with the use of supplementary aids and services); Greer v. Rome City School Dist., 950 F.2d 688 (11th Cir. 1991) (adopting Daniel R.R. test); Oberti v.

Board of Ed. of Clementon School Dist., 995 F.2d 1204 (3rd Cir. 1993) (adopting and elaborating on Daniel R.R. test).[4]

In the HOD's Decision and Conclusion of Law, the Hearing Officer held that "[a] preponderance of the evidence supports DCPS [sic] contention that the self-contained model...could provide [A.H.] academic benefit and, therefore, it would represent a free and appropriate public education." R. 11. The Hearing Officer later reiterated that "the Key School is an appropriate placement and capable of providing a free appropriate public education. It is therefore appropriate for DCPS to issue a prior notice to the Key School for the 2005-2006 school years [sic]." R. 12.

In neither of those two conclusions did the Hearing Officer make any mention of the requirement of an LRE. R. 11-12. At no point did the Hearing Officer determine whether A.H. could be educated in an environment less restrictive than the one proposed by DCPS.

The Hearing Officer did acknowledge at two different points that the Plaintiffs had argued that The River School represented the LRE, but failed to acknowledge that

---

[4] Many of the cases use the term "mainstreaming" to refer to the education of disabled children with nondisabled peers. As the court observed in Oberti, "some educators and public school authorities have come to disfavor use of the term 'mainstreaming' because it suggests, in their view, the shuttling of a child with disabilities in and out of a regular class without altering the classroom to accommodate the child. They prefer the term 'inclusion' because of its greater emphasis on the use of supplementary aids and support services within the regular classroom to facilitate inclusion of children with disabilities. While 'inclusion' may be a more precise term, we will nonetheless use the term 'mainstreaming' because it is currently the common parlance. Moreover, as we discuss below, 'mainstreaming' as required under IDEA does not mean simply the placement of a child with disabilities in a regular classroom or school program." 995 F.2d at 1207, footnote 1 (internal citations omitted).

At the April 14, 2005 hearing, the Plaintiffs' expert in special education testified regarding the differences between "mainstreaming," "inclusion," and "self-contained" settings as the terms are now used in this geographic area. R. 362-366. By her testimony, while in both a mainstreaming setting and an inclusion setting a disabled child is educated with nondisabled peers, they differ in that by an inclusion approach, the child spends all of his or her time with nondisabled peers, with needed supports brought into the general education class, while by a mainstreaming approach the child begins in a separate special education class and works his or her way into regular education classes. Id.

the law requires that A.H. be educated in the LRE. R. 4, 11. In fact, the Hearing Officer

discussed the issue of LRE as a matter of preference: "The parent's [sic] prefer an

'inclusive model' which includes full participation in a regular classroom with age

appropriate non-disabled peers. DCPS recommends a 'self-contained model.'" R. 4.

During the hearing, the Hearing Officer appeared to be unaware of, or confused

about, the LRE requirement. At the start of the hearing, when the Plaintiffs moved for

immediate judgment on the basis of LRE, the Hearing Officer asked:

> Where do you get the fact – where do you get your argument that DCPS has to
> show that the least restrictive placement is one in which he is achieving success
> and, therefore, they can't remove him? Where do you get that from?

R. 197. Shortly afterwards, the Hearing Officer asked:

> So, you're suggesting that the specialized instructions, while proper and
> appropriate, that they should be provided in a program that's least restrictive,
> rather than a full inclusion program?

R. 201. During the Plaintiffs' closing, this exchange occurred:

> HEARING OFFICER JONES: Well, you're suggesting, in essence, that DCPS
> has not only the burden by a preponderance of the evidence that they have an
> appropriate placement that the placement is what, did you say?
> MR. TYRKA: Less restrictive environment.

R. 393-397.

The Hearing Officer ordered the Parties to brief the question of "whether [l]east

restrictive requirement is the requirement of the law." R. 394. The Plaintiffs timely

submitted a brief containing many of the arguments and legal citations contained in this

Memorandum. R. 15-22.

Despite the fact that the Plaintiffs, at the hearing and in their brief, presented the

Hearing Officer with clear statements of the LRE requirement and made clear that they

contested the IEP on that basis, the Hearing Officer never properly addressed the

question. The law, as reviewed above, requires a determination not only that an IEP placement is appropriate, but that the IEP provides for education with nondisabled students whenever possible. The Hearing Officer determined (erroneously) that the IEP's prescription of a placement entirely out of general education was appropriate, but never determined whether it was possible to educate A.H. with nondisabled peers.

## II.    DCPS' PROPOSED PLACEMENT SHOULD BE REJECTED BECAUSE DCPS FAILED TO PROVE THAT A.H. CANNOT BE EDUCATED IN A LESS RESTRICTIVE ENVIRONMENT

By District of Columbia regulation, DCPS bore the burden of proof at the administrative level in the dispute over A.H.'s placement. See CDCR 5-3030.3.

DCPS has proposed that A.H. be placed in a self-contained special education class composed entirely of disabled children – the most restrictive environment possible. R. 121-123, 216, 364-365. Because the parents objected to A.H. being educated solely with disabled peers, DCPS was required to prove that A.H. could not be educated "satisfactorily" in "regular classes with the use of supplementary aids and services." 20 U.S.C. § 1412 (a)(5)(A) According to Rowley and the Circuit court cases cited above, DCPS was required to prove that it would be impossible to educate A.H. with nondisabled peers. See 458 U.S. at 202. DCPS failed to meet that burden.

In this case, the LRE available to A.H. is not a theoretical idea; there is no need to speculate as to what may be possible in a setting with nondisabled peers. A.H. has been educated for years at The River School, where he was originally placed by DCPS. R. 196, 284; Complaint at Paragraph 10. Thus, DCPS was required to prove that The River School, as an example of an available setting in which A.H. can be educated with

nondisabled peers, has not provided and cannot provide a satisfactory education to A.H.
such that it is impossible to continue his education in that environment.

The testimony and documents presented at the hearing indicate that DCPS never
suggested at any time prior to the hearing that The River School had not provided A.H.
with a satisfactory education or that it would be impossible for them to do so. The
testimony and documents regarding the IEP meetings indicate that that DCPS never
raised the issue. R. 121-123, 145-168.

To the contrary, DCPS declined to make such a claim in several sections of its
own documents dedicated to that purpose. In the "Explanation for removal out of regular
education classroom," section of the IEP, DCPS stated only, "The student is in need of an
out of gen. ed. setting." R. 167. In the "Placement Considerations and Justification"
section, DCPS provided only the following "reason" for rejecting a full-time general
education placement and a combination placement: "LRE – rejected." R. 167. In the
"Description and Explanation of agency action proposed or refused" of the "Prior
Notice," DCPS gave no explanation: "Out of general education proposed." R. 168. In the
Prior Notice section for the "Description of Other Options Considered and reasons for
rejection of each option," DCPS again declined to give an reasons for the rejection of the
less restrictive environments: "General education + combination general education with
resource rejected." R. 168.

At the hearing, DCPS similarly failed to offer evidence that The River School had
not provided A.H. with a satisfactory education or that it would be impossible for them to
do so. DCPS did produce any evidence that A.H. had not progressed during his time at
The River School. DCPS did not question any of the specific educational techniques

employed by The River School. To the contrary, the Key School teacher said that she "[didn't] think River School is a bad program," and that she believed that A.H.'s teacher was "fabulous." R. 246, 248. DCPS' expert on the hearing impaired acknowledged that The River School may be able to provide an education as good as the one proposed at Key School: "[DCPS] felt strongly that we could provide an appropriate if not a more appropriate education at Key." R. 259.

The Plaintiffs presented voluminous evidence of the satisfactory (and better) education provided to A.H. at The River School. The special education expert testified that The River School is providing A.H. with an appropriate education, with a state-of-the-art model that is "doing beautifully." R. 375-376, 388. A.H.'s teacher and his parents testified that he has greatly improved while at The River School. R. 325, 328-329, 337-340, 344-346, 351. The River School Speech and Language Director, an expert in speech and language pathology who had known A.H. for years and had observed him on a regular basis, agreed that A.H. had greatly improved in all areas while at The River School. R. 283-285, 303-304, 309-310.

The speech and language evaluation supports that testimony. The evaluation indicates that in late 2003/early 2004, A.H.'s speech and language abilities ranged from those of a two-year-old to those of a three-year-old. R. 106-113. While those levels were still far below A.H.'s chronological age of 4 years, 9 months at that time, they indicate great progress from the time A.H. enrolled at The River School. At that time, A.H. had no speech and language at all. R. 294. In fact, because he had only recently been fitted with hearing aids, A.H.'s communication abilities, as a matter of brain development, were at the level of an infant, or perhaps even a fetus. R. 287-288, 290-296. In sum, then, the

evaluation indicates that during A.H.'s first two years and a few months at The River School, he acquired from two to three years of speech and language ability.

At a very practical level, as perceived by his parents and teacher, during his time at The River School A.H. has progressed from a 10-word vocabulary to the ability to have normal conversations with peers and adults. R. 325, 345-346.

Despite all of that evidence the Hearing Officer found that there had been "[n]o significant improvement in [A.H.'s] expressive language scores," and that "he is not obtaining reasonable academic benefit." R. 5, 9. In support of those conclusions, the Hearing Officer cited nothing other that the speech and language evaluation. Id. The Hearing Officer did not cite any support for the conclusion that A.H.'s two-to-three years' worth of improvement during his two years at The River School was not significant or reasonable. To the contrary, the only speech and language expert to testify at the hearing stated that A.H.'s progress was good, and exactly what one would expect to see, given his disabilities. R. 287-296.

All of the evidence indicated that A.H. will continue to receive a satisfactory education in a less restrictive environment if he is allowed to continue at The River School. The River School specializes in educating children with mechanically aided hearing in an environment with nondisabled peers. R. 296-301.

The River School provides the intensive, oral language-based environment that A.H. needs. R. 113, 300-301. The River School has nearly one speech/language pathologist on staff for every disabled student in the school. R. 299, 306. Each class is co-taught by a teacher and a full-time, dedicated speech/language pathologist. R. 298-299. Perhaps most importantly, The River School provides A.H. with constant interaction and

side-by-side learning with nondisabled linguistic and social models, who are vital to A.H.'s development. R. 34, 106, 113, 148, 214-215, 232-233, 298-299, 304, 328-329, 337-340, 346-347, 352-356, 375-376, 388-389.

Because DCPS did not prove that it is impossible for A.H. to be educated in a environment less restrictive than their proposed placement, the Court should order the Defendants to continue A.H.'s placement and funding at The River School, the less restrictive environment.

**III.    DCPS' PROPOSED PLACEMENT SHOULD BE REJECTED BECAUSE DCPS FAILED TO PROVE THAT THE PLACEMENT CAN PROVIDE A.H. AN APPROPRIATE EDUCATION**

Had DCPS proved at the hearing that A.H. could not be educated in an environment less restrictive than the one they were proposing, they would still have had to prove that their proposed placement was appropriate for A.H. They failed to do so.

Under the IDEA, A.H. is entitled to "a free appropriate public education that emphasizes special education and related services designed to meet [his] unique needs." 20 U.S.C. § 1400(d)(1)(A). The IDEA requires that DCPS provide A.H. with an IEP including an appropriate school placement. 20 U.S.C. § 1414(d)(2).

"[A] 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. Rowley, 458 U.S. at 188-189. "[T]he 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Id. at 201.

According to the speech and language evaluation and the opinion of everyone familiar with him, A.H.'s unique needs include, among others, an educational environment that includes nondisabled peer language models. R. 34, 113, 304, 337, 346-347, 346-347, 352-356, 389. DCPS has presented nothing to contest that fact. The Key School placement, in which A.H. would be educated in a self-contained class of only disabled children, would not provide A.H. with that environment.

Because DCPS' proposed placement would not provide for A.H.'s unique needs, and therefore is inappropriate for A.H., even if the Court finds that A.H. cannot be educated in a less restrictive environment, it should order the Defendants to provide a new placement for A.H. that is appropriate to his needs.

## CONCLUSION

Because DCPS failed to prove that A.H. could not be satisfactorily educated in an environment less restrictive than its proposed placement, and failed to prove that its proposed placement was appropriate for A.H., the Court should reject DCPS' proposed placement and order the Defendants to continue A.H.'s placement and funding at The River School.

Respectfully submitted,

/s/_____
Douglas Tyrka, #467500
2807 27th St., NW
Washington, DC  20008
(202) 332-0038

24

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)......................................................12

Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176 (1982)..................................................................11, 15, 16, 17, 20, 24

Daniel R.R. v. State Board of Educ. 874 F.2d 1036 (5th Cir. 1989)...................................17

Greer v. Rome City School Dist., 950 F.2d 688 (11th Cir. 1991)......................................17

Honig v. Doe, 484 U.S. 305 (1988)....................................................................................9

Kerkam v. McKenzie, 862 F.2d 884 (D.C. Cir. 1988)......................................................12

Oberti v. Board of Ed. of Clementon School Dist., 995 F.2d 1204 (3rd Cir. 1993).....17, 18

Roncker v. Walter, 700 F.2d 1058 (6th Cir. 1982).............................................................17

**Statutes and Regulations**

20 U.S.C. § 1400...........................................................................................2, 9, 10, 11, 24

20 U.S.C. § 1402......................................................................................................................9

20 U.S.C. § 1412..................................................................................................10, 17, 20

20 U.S.C. § 1414................................................................................................9, 11, 24

20 U.S.C. § 1415................................................................................................11, 12, 15

34 C.F.R. § 300.300...........................................................................................2, 9, 11

34 C.F.R. § 300.320................................................................................................................9

34 C.F.R. § 300.342................................................................................................................9

34 C.F.R. § 300.343................................................................................................................9

34 C.F.R. § 300.344................................................................................................................9

34 C.F.R. § 300.345................................................................................................................9

34 C.F.R. § 300.346................................................................................................................9

34 C.F.R. § 300.347................................................................................................................9

34 C.F.R. § 300.500................................................................................................................9

34 C.F.R. § 300.531................................................................................................................9

34 C.F.R. § 300.532................................................................................................................9

34 C.F.R. § 300.533..............................................................................................................10

CDCR 5-3030................................................................................................................12, 20