THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTWAUN HAWKINS, et al.,
      Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al.,
      Defendants.

Civil Action No. 05-1247 JR

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

**A.H.'s Disabilities and Needs**

1. A.H. has had a moderate to severe hearing loss since birth. R. 287-288.[1]

2. A.H. uses digital hearing aids. R. 287.

3. When using his hearing aids, A.H. has only a mild hearing loss. R. 287.

4. When using his hearing aids, A.H.'s hearing is adequate to conduct normal conversation. R. 352.

5. A.H. did not begin using his hearing aids until he was approximately 2.5 years old. R. 287-288; Complaint at Paragraph 1.

6. A.H. had no mode of communication at all at the time he began using his hearing aids. R. 294.

7. Because A.H. could not hear or communicate at all until he was approximately 2.5 years old, he suffers from moderate to severe speech and language disabilities. R. 112, 293-295.

---

[1] The Administrative Record is not attached to the Plaintiffs' Motion and Memorandum, as it has already been filed by the Defendant.

8. According to the most recent evaluation in the record, when A.H. was 4 years, 9 months old, his speech and language abilities ranged from the equivalent of 2 years old to 3 years old. R. 107-111.

9. A.H.'s greatest lag was in articulation. R. 111.

10. A.H.'s speech and language disabilities currently have a greater impact on him than does his hearing impairment. R. 378-380.

11. A.H. needs daily support for speech and language. R. 147.

12. A.H. "needs an intensive, oral language-based learning environment with an emphasis on auditory-linguistic skill building and interactive opportunities for learning." R. 113.

13. A.H. needs language models as part of his education. R. 34.

14. A.H. needs to be educated with a small group of nondisabled peers, who can provide him with appropriate language and social modeling. R. 113.

15. Education with nondisabled peers is very important to A.H.'s education. R. 337, 346-347.

16. Involvement and competition with nondisabled peers encourages A.H. to succeed in school. R. 352-356.

17. If A.H. is removed from a setting that includes nondisabled peers, his education will suffer. R. 304, 346-347, 389.

**A.H.'s Current Placement at The River School**

18. A.H. has been attending The River School since November 2001. R. 284.

19. A.H. was originally placed at The River School by the District of Columbia Public Schools ("DCPS"). R. 196; Complaint at Paragraph 10.

20. The River School was founded to educate children with mechanically aided hearing in an environment with nondisabled peers, and it specializes in that model. R. 296-301.

21. The River School's goal for its disabled students is to transition them into regular education programs in which they need little if any special supports. R. 312.

22. The River School has accomplished that goal with students similar to A.H. R. 311.

23. The River School is an "inclusion" program, in which each disabled student is educated entirely in classes in which the majority of students are not disabled. R. 214-215, 232-233, 298-299.

24. Approximately 90% of the student body at The River School do not have any disabilities. R. 299.

25. The River School is an intensive, oral language-based environment. R. 300-301.

26. The River School provides "natural opportunities for language growth." R. 148.

27. The River School has fourteen speech/language pathologists on staff, and a student body of 172 students, only 10% of whom are disabled. R. 299, 306.

28. Each class at The River School is co-taught by a teacher and a full-time, dedicated speech/language pathologist. R. 298-299.

29. During the 2004-2005 school year, in addition to A.H. the students in A.H.'s class at The River School consisted of six children without any disabilities, one child with a hearing impairment, and another child with aided hearing whose overall disabilities were negligible. R. 302-303.

30. Like every class at The River School, A.H.'s class was taught by a teacher and a speech/language pathologist. R. 302.

31. The speech/language pathologist co-teaching A.H.'s class had training in the anatomy and physiology of the oral mechanism. R. 148.

32. In addition to her work in the classroom, the speech/language pathologist participated in the development of the lesson plans for A.H.'s class. R. 334-335.

33. A.H.'s teacher had been certified for 35 years, and had been teaching for 24-25 years. R. 321.

34. A.H.'s teacher had been teaching at The River School for four years. R. 322.

35. A.H.'s teacher had daily contacts with speech/language pathologists in addition to the one dedicated to A.H.'s class. R. 322.

36. Instructors of the deaf and hard of hearing at The River School often go to A.H.'s teacher for teaching advice. R. 322-323.

**A.H.'s Progress and Educational Opportunity at The River School**

37. The River School is providing A.H. with an appropriate education, with a state-of-the-art model that is "doing beautifully." R. 375-376, 388.

38. A.H. has greatly improved during his time at The River School. R. 39, 344, 351.

39. At The River School, A.H. has progressed educationally, socially, and in receptive and expressive communication. R. 115, 303-304, 309-310, 325.

40. In his first two years at The River School, A.H. progressed from having no mode of communication at all to communicating verbally at skill levels ranging from those of a typical 2-year-old to those of a typical 3-year-old. R. 106-113, 294.

41. During his time at The River School, A.H. has progressed from a 10-word vocabulary and an inability to speak in sentences to extended conversations with adults and peers. R. 325, 345-346.

42. At The River School, A.H. has received "significant[] benefit from the inclusion model with typically developing peers and benefits from learning from a master's level education teacher and speech language pathologist." R. 106.

43. A.H. has particularly benefited from his time spent at The River School with nondisabled peers. R. 328-329, 337-340.

44. A.H. has good social contacts at The River School among both children with disabilities and those without. R. 325-328.

45. DCPS has not specifically criticized any teaching technique employed at The River School.

46. The teacher from DCPS' proposed placement "[does not] think River School is a bad program." R. 248.

47. The teacher from DCPS' proposed placement believes that A.H.'s teacher is "fabulous." R. 246.

48. The DCPS expert on the hearing impaired acknowledged that The River School may be able to provide an education as appropriate for A.H. as could Key School. R. 259.

**DCPS' Proposed Placement at Key School**

49. Key School, DCPS' proposed placement, is "brand new." R. 265.

50. As of April 2005, the classroom teacher at DCPS' proposed placement had only taught one full year of school previously. R. 238-239.

51. Key School does not have a full-time speech/language pathologist on staff. R. 279.

52. Were A.H. to attend Key School, DCPS' proposed placement, he would be in a "self-contained classroom" with only other disabled children. R. 216.

5

53. At Key School, when the hearing impaired children do have opportunities to interact with nondisabled students, they tend to self-segregate. R. 371-372.

54. DCPS has not represented that A.H. would receive any specific instruction or service that he does not receive at The River School.

55. DCPS has not indicated in what way an instructor of the deaf and hard of hearing teaches differently than does the co-teaching team at The River School.

**Dispute Over IEP and Placement**

56. DCPS originally attempted to move A.H. from The River School to Key School at a June 21, 2004 IEP meeting. R. 121-123.

57. At the June 21, 2004 meeting, DCPS justified its proposal of Key with the sole statement that "D.C.P.S. feels that Key Elem...is an appropriate placement for the student." R. 123.

58. Following the filing of an administrative hearing request by A.H.'s parents alleging that DCPS had failed to allow them full participation in the placement decision and had failed to propose an appropriate placement, DCPS agreed to a consent order to reconvene the placement meeting. R. 137-140.

59. DCPS convened a new MDT/IEP meeting on January 7, 2005. R. 145-168.

60. At the January 7, 2005 meeting, the team agreed on the IEP goals and objectives, but did not agree on DCPS's proposal of a placement for A.H. out of general education. R. 150, 316-317.

61. More specifically, "[t]he team disagreed on service providers" at the January 7, 2005 meeting. R. 148.

62. At the January 7, 2005 meeting, DCPS proposed that A.H. be provided his specialized instruction by an educator of the hearing impaired, among others, and that he be educated completely outside of general education. R. 152, 167, 168.

63. At the January 7, 2005 meeting, A.H.'s parents, A.H.'s teacher, A.H.'s classroom speech/language pathologist, and The River School Speech and Language Director argued for A.H.'s continued placement at The River School. R. 259, 316-317.

64. At the January 7, 2005 meeting, the parents stated their understanding "that full time specialized instruction as indicated on page 1 of the IEP does not equate to full time special education in a self contained classroom." R. 150.

65. A.H.'s parents did not sign the IEP to indicate their approval of it. R. 152.

66. At the January 7, 2005 meeting, DCPS did not provide any reasons why A.H. could not be educated in a general education setting. R. 145-168.

67. In the IEP documentation from January 7, 2005, in the section entitled "Explanation for removal out of regular education classroom," DCPS stated only, "The student is in need of an out of gen. ed. setting." R. 167.

68. In the IEP documentation from January 7, 2005, in the section entitled "Placement Considerations and Justification," as the reason for rejecting a full-time general education placement and a combination placement, DCPS stated only, "LRE – rejected." R. 167.

69. In the January 7, 2005 written "Prior Notice" proposing the transfer to Key School, in the section entitled "Description and Explanation of agency action proposed or refused," DCPS stated only "Out of general education proposed." R. 168.

70. In the January 7, 2005 written "Prior Notice" proposing the Key School placement, in the section entitled "Description of Other Options Considered and reasons for rejection of each option," DCPS stated only "General education + combination general education with resource rejected." R. 168.

                                              Respectfully submitted,

                                              /s/ _____
                                              Douglas Tyrka, #467500
                                              2807 27th St., NW
                                              Washington, DC  20008
                                              (202) 332-0038